UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DIANA FERNANDEZ,

                         Plaintiff,

          -against-                                    1:06-CV-00479 (LEK)

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,[1]

                    Defendant.
_____

APPEARANCES:                           OF COUNSEL:

OFFICE OF STEPHEN J. MASTAITIS, JR.    STEPHEN J. MASTAITIS, JR., ESQ.
1412 Route 9P
Saratoga Springs, New York 12866
*Attorney for Plaintiff*

SOCIAL SECURITY ADMINISTRATION         SUSAN C. BRANAGAN, ESQ.
OFFICE OF REGIONAL GENERAL COUNSEL
Region II
26 Federal Plaza - Room 3904
New York, New York 10278
*Attorney for Defendant*

**LAWRENCE E. KAHN, SENIOR UNITED STATES DISTRICT JUDGE**

**DECISION AND ORDER**

**I.      BACKGROUND**

_____

     [1] Plaintiff filed his complaint on April 17, 2006, and named Jo Anne B. Barnhart, now the former Commissioner of Social Security, as the Defendant.  On February 12, 2007, Michael J. Astrue took office as Commissioner of Social Security.  Therefore, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, the Court has substituted him as the named defendant, and no further action is required to effectuate this change.  See 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

**A.      Procedural History**

Plaintiff Diana Fernandez filed applications under Title II and Part A of Title XVIII of the

Social Security Act ("Act") for a period of disability and disability insurance benefits ("DIB") and

supplemental security income ("SSI") on October 23, 2003.  Plaintiff alleged January 30, 1993, as the

date of onset of her disabling condition.  Administrative Transcript ("AT") 69-71.  The Social Security

Administration initially denied Plaintiff's application on March 22, 2004, AT 30-33, and Plaintiff

requested a hearing before an Administrative Law Judge ("ALJ") on May 14, 2004.  AT 35.  ALJ

Thomas P. Zolezzi held a hearing on April 8, 2005, in Albany, New York, at which Plaintiff appeared

with counsel and testified.  In addition, Peter Manzi, Ed.D., a vocational expert ("VE"), testified.  AT

478-528.  On August 25, 2005, the ALJ issued his decision, which found that Plaintiff was not disabled

as defined by the Act from January 30, 1993, through August 25, 2005, and that she was neither entitled

to a period of disability, DIB nor SSI.  AT 18-27.  Plaintiff filed a request for review of the ALJ's

decision and order on September 10, 2005.  AT 12.  The Appeals Council denied Plaintiff's request for

review of the ALJ's decision on March 16, 2006, and thus the ALJ's decision became a final

determination of the Commissioner.  AT 3-5.  Having exhausted her administrative remedies, Plaintiff

commenced this action on April 17, 2006, pursuant to 42 U.S.C. § 405(g), seeking review of the

Commissioner's final decision and entry of judgment in her favor.  Dkt. No. 1.  The Commissioner filed

an answer seeking dismissal of Plaintiff's complaint and judgment in accordance with Section 205(g) of

the Act affirming his final determination.  Dkt. No. 7.

**B.      Contentions**

Plaintiff makes the following claims:

(1) The ALJ failed to properly evaluate and credit Plaintiff's testimony.  Dkt. No. 10 at 9-14.

(2) Substantial evidence does not support the ALJ's decision that Plaintiff retained the residual functional capacity ("RFC") to perform a full range of light/sedentary work.  Dkt. No.10 at 14-15.

Defendant argues that substantial evidence in the record supports his determination that Plaintiff's impairments did not prevent her from engaging in substantial gainful activity and that his determination must be affirmed.  Dkt. No. 17 at 3.

## C.    Plaintiff's Background and Testimony

Plaintiff was forty-seven years old at the time of the hearing.  AT 69, 480.  Plaintiff is five foot, two inches tall and at the time of the hearing weighed 230 pounds.  Plaintiff has her high school diploma and has completed community college courses in counseling and chemical dependency.  AT 480.  Plaintiff is not married and has two sons, ages twenty-eight and twelve, neither of whom live with her.  AT 150, 481.  Plaintiff's past vocational experience consists of working as a cashier at a clothing store and a supermarket where she bagged merchandise and goods and counted transactional money.  She testified that she stood during her previous work.  AT 483-84.  Plaintiff testified that she had not worked since 1992, at which time she was pregnant and addicted to drugs.  AT 484-85.  She testified that she does not drive and relied upon medical transportation, regular public transportation, her eldest son and friends for rides to and from school and appointments.  AT 483, 499-500, 502, 503.

Plaintiff testified that she kept her apartment clean but that it took a long time for her to, for example, dust or vacuum or mop the floor.  She testified that she laundered her clothes at home and had no difficulty changing her bed.  AT 501.  She testified that she experienced no problems dressing herself or attending to her personal care but added that she sometimes used a shower chair to assist in bathing herself.  AT 507.  Plaintiff testified that her son took her grocery shopping, that she had no problem pushing the grocery cart up and down the aisles and placing items inside the cart and that she

completed her grocery shopping within about a half an hour.  AT 499-500, 512.  She testified that she kept her meal preparation simple and had no difficulty placing pots of water on the stove to boil.  AT 500-01.

She testified that she attended community college Monday through Friday and used her walker to carry her class materials.  As to her class schedule, Plaintiff testified that on Mondays she attended classes from 10:00 a.m. until 1:00 p.m., attended a club meeting at 2:00 p.m. and attended an evening course from 6:00 p.m. until 8:00 or 8:30 p.m.; on Tuesdays she attended a one-hour class; on Wednesdays she attended an evening class from 6:00 p.m. until 8:00 or 8:30 p.m.; on Thursdays she attended a one-hour class; and on Friday she had attended a class from 8:00 a.m. until 10:00 a.m. followed by a short break and then a one-hour class.  AT 503-04.  Plaintiff testified that she had a "hard time keeping up" with her assignments and received assistance through the disability office at school so that she had extra time to take tests.  AT 510.

Plaintiff testified that she walked with the assistance of her walker five blocks to a park with her grandchildren and stayed there for an hour to an hour and a half so that they could play.  She testified that such outings fatigued her.  AT 505, 513.  Plaintiff testified that she attended church and sat through services lasting between an hour and an hour and a half.  She testified that she went out to the movies two or three times per year.  Plaintiff testified that she had attended Alcoholics Anonymous meetings near her residence.  AT 502.

Plaintiff testified that she could sometimes stand for a half hour, and other times for no longer than fifteen to twenty minutes.  She testified that if fatigue overcame her, then she sat on the seat of her walker.  Plaintiff testified that she had no physical problems associated with sitting.  She also testified that she could bend, kneel or squat to lift something from the ground and estimated that she could lift

4

twenty pounds.  She further testified that she had no problems with her hands or with her ability to grasp and hold things.  AT 499.

Plaintiff estimated that during the daytime, she fell asleep four times for up to an hour while sitting down, AT 506, and she testified later during the hearing that she fell asleep during her classes for five or ten minutes.  AT 511-12.  Plaintiff testified that her fatigue was related to her hypertension, sleep apnea and eating too much, which slowed her down immensely.  She testified that when fatigue overcame her it felt as though she were "hit with a bomb."  AT 495.  Plaintiff testified that she had days where she had to "just take it slow."  AT 483.   Plaintiff testified that she missed a week of classes in February of 2005 due to migraine headaches.  AT 512.

**D.**	**Medical Treatment History**

**1.**	**Columbia Presbyterian Medical Center**

Columbia Presbyterian Medical Center ("Columbia") admitted Plaintiff, who presented with complaints of shortness of breath, from August 27 to September 2, 2003.  The attending physician, Carlos Rodriguez, M.D., noted Plaintiff's medical history which included, *inter alia*, reports of pulmonary hypertension.  Upon physical examination, Dr. Rodriguez noted that Plaintiff's blood pressure was 135/75, that she was significant for bibasilar crackles on her lung exam, but had a regular cardiac rate and rhythm and normal heart sounds without a murmur.  He further noted pitting edema on her lower extremities bilaterally.  An electrocardiogram ("EKG") revealed no changes.  He noted no evidence of cardiac ischemia or coronary artery disease but that she had been in and out of atrial fibrillation. Dr. Rodriguez also noted that Plaintiff suffered from a number of headaches during the

period of her admission and that she received Fioricet[2] to treat them.  Dr. Rodriguez suspected that Plaintiff had obstructive sleep apnea, which he opined may have been responsible for her pulmonary hypertension.  He also suspected poor dietary compliance.  Dr. Rodriguez noted that Plaintiff had a history of hypothyroidism and that she had an elevated level of thyroid stimulating hormone on admission.  He noted that her Synthroid[3] prescription was increased from 125 micrograms to 150 micrograms once per day.  AT 150-52.

Columbia again admitted plaintiff who presented with complaints of chest pain from November 8 to 11, 2003.  The attending physician, Robert Basner, M.D., noted that the day prior to Plaintiff's admission, she had consumed alcohol and used crack cocaine.  Dr. Basner noted that an EKG neither revealed any changes nor suggested ischemia or infarction.  AT 164, 167.  Upon physical examination, Dr. Basner noted that Plaintiff's lungs were clear to auscultation bilaterally and that her heart had a systolic murmur.  He observed no edema on Plaintiff's legs.  AT 164.  Plaintiff underwent a computerized axial tomography scan of her chest, which revealed an ecstatic proximal ascending aorta, an enlargement of the main pulmonary artery, patchy focus of atelectasis but an otherwise unremarkable examination of the lungs, and no evidence of aortic dissection.  AT 166.  Dr. Basner's diagnosis at discharge was "chest pain possibly secondary to vasospasm from cocaine use."  AT 165.

### 2.     Olai Sam, M.D.

---

[2] Fioricet is a preparation of acetaminophen, butalbital and caffeine, http://www.pdr.net, last visited April 1, 2009; butalbital is a short- to intermediate-acting barbiturate used as a sedative in combination with an analgesic in the treatment of tension or migraine headache.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 269 (31st ed. 2007).

[3] Synthroid is a preparation of levothyroxine sodium, used as replacement therapy for hypothyroidism.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1046, 1879 (31st ed. 2007).

Dr. Sam began treating Plaintiff on December 5, 2003.[4]  AT 305-306.  Dr. Sam noted that Plaintiff's complete physical examination was within normal limits, except for pitting edema bilaterally and varicose veins.  AT 306.  On January 8, 2004, Plaintiff reported continued problems with chronic daily headaches.  AT 303.  On February 24, 2004, Plaintiff complained of general malaise with coughing and nausea, and Dr. Sam diagnosed an upper respiratory infection with chronic cough.  AT 300.  On March 4, 2004, Plaintiff complained of cough, chest congestion and cysts in her right groin and left lower abdominal areas.  Dr. Sam diagnosed acute bronchitis and recommended further evaluation with respect to the cysts.  AT 298.  On March 15, 2004, Plaintiff complained of a persistent cough, and Dr. Sam advised her to follow up with her pulmonologist because her pulmonary hypertension "could be playing a role in her cough."  AT 296.  On April 12, 2004, Plaintiff complained of a skin rash on her neck, and Dr. Sam diagnosed dermatitis.  AT 294.  On May 18, 2004, Plaintiff presented with a skin rash, and Dr. Sam diagnosed sun poisoning.  AT 292.  On July 30, 2004, Plaintiff treated with Dr. Sam for an immunization update.  AT 285.  On August 24, 2004, Plaintiff presented with complaints of a cough, runny nose and generalized body aches, and Dr. Sam diagnosed an upper respiratory infection and acute bronchitis.  AT 284.  On September 23, 2004, Plaintiff presented with right elbow pain, but upon examination Dr. Sam noted no swelling and only mild tenderness with pressure at the lateral condyle.  She diagnosed tendinitis.  AT 283.  On October 5, 2004, Dr. Sam noted a normal musculoskeletal examination finding normal gait, joints, bones and muscles and that Plaintiff's complete physical examination was within normal limits.  AT 403.  On October 29, 2004, Dr. Sam diagnosed acute bronchitis but described an otherwise unremarkable examination.  AT 281.

---

[4] Plaintiff testified that Dr. Sam was her primary care physician and that she was treated by Dr. Sam every few months for fatigue, feminine health issues and her thyroid condition.  AT 486-87.

On January 27, 2005, Dr. Sam noted a regular and rhythmic heart with no murmurs, stable and well controlled hypothyroidism, aortic aneurysm and atrial fibrillation.  AT 400.  On March 18, 2005, Dr. Sam opined that Plaintiff was "extremely disabled in terms of her abilities to work."  AT 280.

### 3.    Abdul Khan, M.D.

Plaintiff treated with Dr. Khan, a neurologist, on May17, 2004.  Dr. Khan noted that for the last three to four years Plaintiff had headaches every few days that lasted one to two days.[5]  Plaintiff indicated to Dr. Khan, however, that her headache control was "reasonably good" if she took her medications.  AT 274.  He noted that Plaintiff's gait and station were normal and that her motor strength was "5/5" in her upper and lower extremities.  Dr. Khan noted that Plaintiff was awake, alert and oriented to time, place and person.  He characterized her attention span and concentration as good and described her recent and remote memory as intact.  AT 275.  Dr. Khan's probable diagnosis was chronic paroxysmal hemicrania.  AT 276.  Dr. Khan treated Plaintiff on July 28, 2004, and found Plaintiff alert, awake, and oriented to time, place, and person.  He noted that her recent and remote memory were intact.  Dr. Kahn noted that her motor strength was "5/5" in all extremities and that her gait and station were normal.  AT 272-73.  Dr. Khan noted that Plaintiff's headache control was better

---

[5] Plaintiff testified that her headaches occurred a few times per week and sometimes on a daily basis.  AT 488-89.  Plaintiff relatedly testified that an assailant hit her in the back of her head and over her right eye with a bat or a pair of brass knuckles in connection with her "unsavory past lifestyle."  AT 489.  She testified that she suffered a detached retina in her right eye and experienced pain spreading from her right eye to the back of her head as a result of the attack.  AT 489; see also AT 114 (attributing her migraine headaches to the assault).

on a regime of Neurontin[6] and Indocin,[7] "but when she tries to taper off these medicines, the headaches [return]." AT 272. Dr. Khan noted that Plaintiff's fatigue was "multifactorial due to a combination of pulmonary hypertension, obstructive sleep apnea, depression and polypharamacy." AT 273. Dr. Khan treated Plaintiff on December 28, 2004. Dr. Khan performed a neurological examination and found Plaintiff to be alert and awake. He found that she was oriented to the month and the year, knew the President's name and knew that there were seven quarters in $1.75. Dr. Khan noted that her memory recall was three for three after three minutes. He noted that her motor strength was "5/5" in all extremities and that her gait and station were normal. AT 271. On March 11, 2005, Dr. Khan noted that Plaintiff was alert, awake and oriented to time, place and person. He observed that her attention span and concentration were normal while her gait was steady. Dr. Khan noted that Plaintiff's headaches were under good control while she took indomethacin, but that since discontinuing its use due to elevated blood pressure she had daily headaches. AT 314-15.

### 4. Vina R. Patel, M.D.

Plaintiff treated with Dr. Patel, an internist, on November 8, 2004. Dr. Patel diagnosed her as a recovering addict who suffered from obesity, hypertension, hyperlipidemia, COPD, atrial fibrillation, and depression. AT 262-65. Plaintiff had chest X-rays taken on November 20, 2004, which revealed central pulmonary artery prominence, right heart enlargement, and consideration of pulmonary arterial hypertension. AT 261. Plaintiff underwent an EKG on November 23, 2004, which revealed, *inter alia*,

---

[6] Neurontin is a preparation of gabapentin, an anticonvulsant used as adjunctive therapy in the treatment of partial seizures. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 764, 1287 (31st ed. 2007).

[7] Indocin is a preparation of indomethacin, a nonsteroidal anti-inflammatory drug used in the treatment and prophylaxis of vascular headaches. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 946 (31st ed. 2007).

mild concentric left ventricular hypertrophy with normal systolic function, mild aortic insufficiency, trace to mild mitral regurgitation but no significant aortic stenosis.  AT 255-56.  Dr. Patel treated Plaintiff on December 6, 2004, and continued her previous diagnoses.  AT 253-54.  Dr. Patel treated Plaintiff on January 6, 2005, and noted that fatigue was Plaintiff's only complaint.  Dr. Patel also noted that Plaintiff took only some of her medication and that she did not want steroids.  AT 251.  Dr. Patel suggested that Plaintiff "should go back to primary M.D. for future care" because he felt that he could not "help with restrictions of meds p[atient is] willing to take."  AT 252; see also AT 411-12.  Plaintiff would later testify that Dr. Patel refused to continue to accept her for treatment, apparently because she did not want to utilize Dr. Patel as her primary care physician.  AT 490, 492.

### 5.    Martin Echt, M.D., Ph.D., Rafael Papaleo, M.D., and Louis Papandrea, M.D.[8]

On January 13, 2004, Dr. Echt, a cardiologist, treated Plaintiff and noted that she currently had no cardiac symptoms but had a history of atrial fibrillation.  He further noted that her blood pressure and fibrillation were controlled.  In addition to atrial fibrillation, Dr. Echt's assessment included benign hypertension, aortic aneurysm, obesity and depression.  Plaintiff underwent an EKG, which revealed mild concentric left ventricular hypertrophy, mild mitral regurgitation and mild to moderate aortic insufficiency.  AT 231-33.  On June 29, 2004, Dr. Echt treated Plaintiff and noted that from a cardiac perspective, she was stable and in normal sinus rhythm.  AT 228-29.

On November 15, 2004, Plaintiff underwent a cardiac catheterization.  Dr. Papaleo, a cardiologist, found no evidence of obstructive coronary artery disease, normal left ventricular systolic function and non-critical renal artery stenosis.  AT 227, 238-39.  On November 30, 2004, Dr. Papaleo

---

[8] Dr. Echt, Dr. Papaleo and Dr. Papandrea were members of a cardiology practice group.  AT 227-29, 231-33, 235.

treated Plaintiff and noted that better control of hypertension was the only immediate issue.  AT 224-25.

On December 29, 2004, Dr. Papandrea, a cardiologist, treated Plaintiff and noted distant heart tones and

a soft diastolic murmur.  AT 235.  He opined that Plaintiff continued to "do very well" and that her

blood pressure was "much better controlled."  AT 236.  Plaintiff underwent an EKG that day, which

revealed mild to moderate aortic insufficiency, normal left ventricular size and systolic function, mild

concentric left ventricular hypertrophy, trace tricuspid regurgitation and a dilated left atria.  AT 246.

On January 26, 2005, Dr. Papaleo's diagnosis was atrial fibrillation, in sinus rhythm with

medication; benign hypertension, presently uncontrolled; aortic aneurysm thoracic; obesity, morbid;

depression; chest pain; unspecified but normal cardiac catheterization; and palpitations, resolved.  AT

312.  On March 16, 2005, Dr. Papaleo noted that Plaintiff appeared well considered from a

cardiovascular standpoint.  Plaintiff had presented with symptoms of chest discomfort, and Dr. Papaleo

opined that her symptoms were not likely cardiac in origin.  AT 309-10.  In a letter dated March 16,

2005, Dr. Papaleo noted the following active medical conditions for which plaintiff was receiving

treatment: (1) paroxysmal atrial fibrillation on chronic low dose; (2) hypothyroidism; (3) obstructive

sleep apnea; (4) secondary pulmonary hypertension; (5) status post head trauma with secondary

migraines; (6) aortic insufficiency; (7) degenerative joint disease; (8) ascending aortic aneurysm and

secondary aortic insufficiency.  AT 308.  On April 13, 2005, Dr. Papaleo reported that Plaintiff

continued to "do very well from a cardiovascular standpoint" and that her blood pressure remained well

controlled.  AT 440-41.

### 6.    Robert Irwin, M.D., and Abdul Azad, M.D.

On March 24, 2004, Plaintiff treated with Dr. Irwin and Rita Alowitz, a registered nurse

associated with Dr. Irwin's practice.  AT 320, 322-23, 342-43.  Plaintiff underwent a polysomnograph,

which documented the presence of severe obstructive sleep apnea with primarily a hypnopic

disturbance.  The polysomnograph also revealed severe accompanying sleep fragmentation and severe

oxygen desaturations particularly during rapid eye movement sleep.  AT 323.  In his assessment of

Plaintiff, Dr. Irwin noted a history of pulmonary hypertension, which he attributed to her obesity,

obstructive lung disease and cardiac disease.  He characterized her history as consistent with sleep

apnea but noted that Plaintiff was not inclined to undergo a sleep study.  AT 343.  On April 28, 2004,

Plaintiff treated with Dr. Irwin.  Upon examination and review of the data, Dr. Irwin opined that

Plaintiff was "presently compensated from a cardiopulmonary standpoint."  AT 341.  An EKG revealed

only a mild amount of aortic insufficiency while pulmonary function tests showed a mild restrictive

ventilatory defect.  AT 341.  On June 9, 2004, Alowitz strongly recommended that Plaintiff proceed

with a continuous positive airway pressure ("CPAP") titration study.  AT 323.  On June 28, 2004,

Plaintiff treated with Alowitz who noted that she had missed her last appointment with Dr. Irwin, which

was her third missed appointment since January of 2004.[9]  She continued to decline a CPAP titration

study or CPAP therapy due to feelings of claustrophobia and anxiety.  Alowitz's assessment was

obstructive sleep apnea and pulmonary hypertension. Plaintiff stated that she was using nocturnal

oxygen "off and on," and Alowitz suspected that Plaintiff was fairly noncompliant with nocturnal

oxygen use.  AT 319-20.

On April 27, 2005, Dr. Azad treated Plaintiff for her sleep apnea.  Plaintiff had no significant

complaints and her experience with a CPAP machine was favorable.  AT 442.  Plaintiff's physical

examination was normal.  AT 443.  Dr. Azad's assessment was that Plaintiff should continue her

---

[9] Plaintiff testified that she failed to keep appointments with Dr. Irwin and relatedly believed that Dr. Irwin would no longer see her as a patient.  AT 490-91.

current medication and sleep therapy treatment.  AT 443.

      **7.**    **Conifer Park**

      Plaintiff sought treatment for depression at Conifer Park beginning on May 20, 2004.  AT 364-81.  At her initial screening, Plaintiff exhibited an euthymic mood, appropriate affect, normal speech and intact thought process.  AT 374.  Plaintiff's initial diagnosis included alcohol and cocaine dependence, depression and anxiety.  Plaintiff's Global Assessment of Functioning ("GAF") was 41.[10] AT 379.  Plaintiff testified that Susan Hayes was her primary counselor and that she treated with her every week and also attended group counseling twice a week.  AT 494.  Plaintiff's progress notes indicate that she treated twenty-two times with Hayes between May 20, 2004 and May 18, 2005. Plaintiff's progress notes indicate that she consistently reported abstinence from drugs and alcohol and often discussed her relationships with her son, a friend and roommates.  AT 348-64, 426-31.  Plaintiff admitted her non-compliance with her anti-depressant medications.  AT 349, 353, 354, 362, 430.  On February 1, 2005, Plaintiff reported having used crack cocaine.[11]  AT 351.   On March 9, 2005, Plaintiff reported that she was "doing well in school" and was "working on finding a part time job to help her to feel better about herself."  AT 349.  On March 16, 2005, however, Plaintiff was upset upon learning that she had become employable through the Department of Social Services.  AT 348.  On May 18, 2005, Plaintiff's progress notes indicated that her college semester was coming to a close and that she was proud of how well she had done.  AT 427.  Plaintiff's discharge summary indicated that her GAF

---

     [10] GAF is a measurement of a person's psychological, social and occupational functioning. A score of 41 indicates serious symptoms or any serious impairment in social, occupational or school functioning. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 32, 34 (American Psychiatric Association, Fourth Ed. Text Revision 2000) ("DSM-IV").

     [11] Plaintiff would later testify that she relapsed with respect to her alcohol and drug usage for a single day on January 30, 2005.  AT 508-09.

score had risen to 50[12] and that she had completed all or most of her treatment goals.  AT 426.

### 8.    Other Physicians

On April 4, 2005, Frederick M. Braunstein, M.D., a gastroenterologist, performed an upper gastrointestinal endoscopy on Plaintiff, which revealed a normal esophagus, stomach and duodenum. AT 418-19.  Tejas R. Pandya, D.P.M., a podiatrist, treated Plaintiff for toenail fungus and pain originating in her toes.  AT 495-96.  Dr. Pandya began treating Plaintiff on January 26, 2005.  AT 474. Dr. Pandya assessed an ingrown toenail right hallux, subungual exostosis left hallux[13] and onychomycosis.  AT 468, 470.  Plaintiff testified that Dr. Pandya thought her pain could be related to arthritis or a "hook."  Plaintiff testified that she needed toenail surgery but planned to delay it until the summer so that she could finish her semester of school uninterrupted by the surgery.  AT 495-96. Plaintiff underwent corrective surgery for her mallet toe on June 2, 2005.  AT 454-57.  Dr. Pandya noted that Plaintiff's condition was "progressing as expected postoperatively."  AT 449.

### E.    State Agency

### 1.    Richard Adler, M.D.

Upon referral from the Division of Disability Determination, on January 14, 2004, Dr. Adler performed an internal medicine examination of Plaintiff.  AT 183.  Dr. Adler noted normal gait and that Plaintiff could walk on her heels and toes without difficulty.  He noted that she could fully squat and arose from her chair during the examination without difficulty.  Dr. Adler noted that although Plaintiff

---

[12] A score of 50 represents the top of the 41-50 range set forth in the DSM-IV; the description, noted above, remains the same.  DSM-IV, 34.

[13] Subungual exostosis is a cartilage-capped reactive bone spur on the distal phalanx, seen most often on the great toe in women.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 669 (31st ed. 2007).

had brought a "rather elaborate walker" with her, she did not use an assistive device during the examination.  He noted that her lungs were clear to auscultation and that her heart beat in regular rhythm.  He observed full flexion, extension, lateral extension and full rotary movement bilaterally in her cervical and lumbar spines.  He observed full range of motion of Plaintiff's shoulders, elbows, forearms, wrists, hips, knees and ankles bilaterally.  Dr. Adler found that her strength was "5/5" in both her upper and lower extremities.  Dr. Adler found no motor or sensory deficits and noted that her hand and finger dexterity were intact with grip strength "5/5" bilaterally.  In his diagnosis he noted: a history of hyperthyroidism; atrial fibrillation; a history of hypertension; a history of addiction and post-addiction depression and anxiety; a history of head trauma with persistent headaches; a history of aneurysm; and morbid obesity.  AT 185-87.  Dr. Adler provided a medical source statement in which he opined that Plaintiff "should limit activities . . . related to significant exertion because of her history of heart failure and pulmonary hypertension."  AT 188.

### 2.    Jacqueline Bashkoff, Ph.D.

Dr. Bashkoff performed a consultative adult psychiatric examination of Plaintiff on February 27, 2004.  Dr. Bashkoff described Plaintiff's then current functioning.  Plaintiff related difficulty sleeping, eating too much, mild anxiety but without any accompanying panic attacks, manic symptomology, thought disorder or cognitive deficits.  Dr. Bashkoff noted many depressive symptoms and that Plaintiff cried during the examination.  Dr. Bashkoff described her mood as dysphoric and depressed.  She described average cognitive functioning and good judgment.  She noted that Plaintiff was able to dress, bathe and groom herself.  Dr. Bashkoff provided a medical source statement in which she opined that Plaintiff could understand and follow simple directions, perform simple tasks and learn new tasks.  Dr. Bashkoff diagnosed Plaintiff as having major depressive disorder–severe but without psychotic

15

features, hypertension, heart failure, pulmonary hypertension, migraine headaches, aortic aneurysm,

depression, hypothyroidism and obesity.  Dr. Bashkoff recommended that Plaintiff begin psychological

treatment to address her violent and abusive background and characterized her prognosis as fair.  AT

195-98.

### 3.    Allan M. Hochberg, Ph.D.

On March 15, 2004, Dr. Hochberg completed a psychiatric review of Plaintiff.  He found that

Plaintiff suffered from major depression, severe but without psychotic features, and cocaine addiction,

for which she was in recovery.  AT 205, 208, 213.  Dr. Hochberg found a mild degree of limitation with

respect to Plaintiff's activities of daily living and social functioning and a moderate degree of limitation

with respect to Plaintiff's concentration, persistence or pace.  AT 215.  Dr. Hochberg found no evidence

of limitation with respect to Plaintiff's ability to: remember locations and work-like procedures;

understand and remember very short and simple instructions; understand and remember detailed

instructions; carry out very short and simple instructions; carry out detailed instructions; maintain

attention and concentration for extended periods; sustain an ordinary routine without special

supervision; work in coordination with or proximity to others without being distracted by them; make

simple work-related decisions; ask simple questions or request assistance; accept instructions and

respond appropriately to criticism from supervisors; get along with coworkers or peers without

distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work

setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use

public transportation; and set realistic goals or make plans independently of others.  He found that

Plaintiff was not significantly limited in her ability to perform activities within a schedule, maintain

regular attendance and be punctual within customary tolerances or in her ability to interact appropriately

with the general public.  He found that Plaintiff was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  He also found Plaintiff was moderately limited in her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  AT 219-20.

In the remarks section of the assessment, Dr. Hochberg characterized Plaintiff's affect as dysphoric and her mood as depressed.  He also found that her orientation was full, that her concentration was intact, that her memory was unimpaired and that her insight and judgment were good.  Dr. Hochberg noted that Plaintiff was well-groomed, cooperative, receptive and expressive with fluent speech and with clear and goal-directed thoughts.  He noted that Plaintiff's eye contact and posture were poor.  Dr. Hochberg further noted that Plaintiff exhibited good insight and judgment.  AT 220-21.  He found "no indication of any limitation in any area except for claimant's socialization . . . . Claimant is able to live alone, attend appointments, shop, manage her daily grooming, prepare meals and travel alone . . . . Claimant is partially credible because the allegations excede [sic] the expected when based on the objective evidence."  AT 221.

## II.   DISCUSSION

### A.   Disability Standard

To be considered disabled, a plaintiff seeking DIB or SSI must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that [s]he
> is not only unable to do h[er] previous work but cannot, considering h[er] age,
> education, and work experience, engage in any other kind of substantial gainful
> work which exists in the national economy, regardless of whether such work exists
> in the immediate area in which [s]he lives, or whether a specific job vacancy exists
> for h[er], or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and 416.920 to

evaluate claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in
> substantial gainful activity.  If [s]he is not, the [Commissioner] next considers
> whether the claimant has a "severe impairment" which significantly limits h[er]
> physical or mental ability to do basic work activities.  If the claimant suffers such
> an impairment, the third inquiry is whether, based solely on medical evidence, the
> claimant has an impairment which meets or equals the criteria of an impairment
> listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the
> [Commissioner] will consider [her] disabled without considering vocational factors
> such as age, education, and work experience; . . . . Assuming the claimant does not
> have a listed impairment, the fourth inquiry is whether, despite the claimant's severe
> impairment, [she] has the residual functional capacity to perform [her] past work.
> Finally, if the claimant is unable to perform [her] past work, the [Commissioner]
> then determines whether there is other work which the claimant can perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir.1982); see 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps.  If the plaintiff

establishes, however, that her impairment prevents her from performing her past work, the burden then

shifts to the Commissioner to prove the final step.  Berry, 675 F.2d at 467 (citations omitted).

In this case, the ALJ found that Plaintiff met the non-disability requirements for a period of

disability and DIB set forth in section 216(i) of the Act through September 30, 1995.  AT 20.  At step

one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset

date.  AT 20.  At step two, the ALJ concluded that Plaintiff's heart impairment, drug and alcohol abuse,

18

in recovery, COPD and depression were "severe" impairments.  AT 20.  At the third step of the

analysis, the ALJ determined that Plaintiff's impairments did not meet or medically equal, either singly

or in combination, one of the impairments listed in 20 C.F.R. 404, Subpart P, Appendix 1.  AT 20.  The

ALJ found that Plaintiff had the RFC to:

> perform light work and is further limited by the following non-exertional
> impairments: (1)  any work she could do must be simple, entry-level work–she can
> make simple decisions but no complex decision-making; (2) there should be no
> concentrated gases, fumes, odors, dust [or] poor ventilation; (3) there should be no
> climbing, no stairs, no heights [and] no dangerous machinery; [and] (4) the job must
> be low stress–no planning, no scheduling, no report writing, no supervising, no high
> production quotas, and no multi-tasking.

AT 21.  At the fourth step, the ALJ found that Plaintiff was able to perform her past relevant work as a

cashier.  Based upon her age–35 years old on the alleged onset date–the ALJ classified Plaintiff as a

younger individual.  The ALJ also found that Plaintiff had a high school education and was able to

communicate in English.  The ALJ determined that transferability of job skills was not an issue because

Plaintiff's past relevant work was unskilled.  AT 25.  The ALJ concluded that in consideration of

Plaintiff's age, education, work experience and RFC, Plaintiff could perform certain jobs existing in

significant numbers in the national economy and that she has not been under a disability as defined in

the Act from January 30, 1993 through the date of the decision.  AT 25, 27.

**B.     Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the ALJ

applied the correct legal standards and whether substantial evidence supports the decision.  Rosado v.

Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing, *inter alia*, Johnson v. Bowen, 817 F.2d 983,

985 (2d Cir. 1987)).  An ALJ must set forth the crucial factors justifying his findings with sufficient

specificity to allow a court to determine whether substantial evidence supports the decision.  Ferraris v.

Heckler, 728 F.2d 582, 587 (2d Cir. 1984).  Regardless of whether substantial evidence appears to support the ALJ's decision, however, a reviewing court may not affirm the ALJ's decision if it reasonably doubts whether the ALJ applied the proper legal standards.  Johnson, 817 F.2d at 986.

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991).  "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "  Williams on behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record.  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  Williams, 859 F.2d at 258 (citations omitted).  A reviewing court, however, cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972); see also Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212 (1983).

## C.   Credibility

Plaintiff submits a number of arguments in support of her contention that the ALJ erroneously failed to fully credit her testimony.  Dkt. No. 10 at 9.  First, Plaintiff argues that a number of facts relied on by the ALJ in support of his credibility determination are entirely consistent with her testimony.  Dkt. No. 10 at 10-11.  Second, Plaintiff essentially argues that the ALJ's decision was internally

inconsistent.  In support thereof, Plaintiff draws the Court's attention to: (1) the ALJ's inaccurate statement that Plaintiff attended school on a daily basis from 10:00 a.m. to 1:00 p.m.; (2) the ALJ's acknowledgment of her allegations that she received accommodations at school, had problems meeting assignment goals, had success at college and had missed a week of school due to her migraine headaches; and (3) the ALJ's rejection of a more restrictive hypothetical posed to the VE by Plaintiff's counsel because there was "no documentation in the record that claimant has missed a significant number of classes due to her migraine headaches; and she reported she did well academically."  Dkt. No. 10 at 11; see AT 21, 22, 27.  Plaintiff appears to suggest that these three selections from the ALJ's decision are irreconcilable and required clarification.  Dkt. No. 10 at 11-12.  Third, Plaintiff submits that the ALJ's conclusion that Plaintiff did well in school demands a reversal because he failed to verify or ask for clarification concerning her school experience and need to sleep in class.  Dkt. No. 10 at 13. Fourth, Plaintiff argues that the ALJ erred in finding that Plaintiff's activities of daily living–attending school and church, shopping, walking to a nearby park, housekeeping and cooking–were inconsistent with her allegations of debilitating migraine headaches and extreme fatigue.  Plaintiff submits that her testimony is "entirely consistent with a person who suffers intermittent but disabling headaches and a need to nap as often as four times per day for periods of between five minutes and [one hour] per nap." Dkt. No. 10 at 12; AT 21-22.  Finally, Plaintiff contends that the questions the ALJ posed to the VE demonstrate that he rejected her testimony that she required breaks in order to function, *e.g.*, at school, and by implication, in a work setting.  Plaintiff submits that the ALJ improperly rejected her testimony concerning the frequency of her headaches and episodes of sleep apnea as being inconsistent with her medical records.  Dkt. No. 10 at 13.

      Defendant argues that the evidence of record did not support Plaintiff's allegations of

incapacitating fatigue and pain and that the ALJ correctly considered the extent of Plaintiff's daily activities in making his credibility determination.  Dkt. No. 17 at 17-18.

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.' "  Lewis v. Apfel, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting Gallardo v. Apfel, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record.  See 20 C.F.R. §§ 404.1529, 416.929; see also Foster v. Callahan, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(a), 416.929(a).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.  20 C.F.R. §§ 404.1529(c), 416.929(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by

the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R.§§ 404.1529(c)(3), 416.929(c)(3).  After considering a claimant's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject the claimant's subjective testimony.  Martone v. Apfel, 70 F. Supp. 2d 145, 151 (N.D.N.Y. 1999); see also 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).

"It is the function of the [Commissioner], not [reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."  Carroll v. Secretary of Health and Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) (citations omitted).  If there is substantial evidence in the record to support the Commissioner's findings, "the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain."  Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (citations omitted).  Furthermore, the ALJ has the benefit of directly observing a claimant's demeanor and other indicia of credibility, which thus entitles the ALJ's credibility assessment to deference.  See Tejada v. Apfel, 167 F.3d 770, 776 (2d Cir. 1999) (citing Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985)); see also Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999).

Here, the ALJ found that Plaintiff's statements concerning the intensity, duration and limiting effects of her symptoms were not entirely credible.  AT 21.  The ALJ discussed Plaintiff's testimony and allegations of subjective pain.  See AT 21-22.  The ALJ noted Plaintiff's testimony that she had intermittent chest pain for which her doctors could not find a cause.  The ALJ noted that Plaintiff treated with her cardiologist every few months and that Plaintiff claimed her medications for atrial fibrillation helped.  The ALJ noted that Plaintiff saw Dr. Sam every few months regarding feminine health concerns and fatigue.  The ALJ noted that Plaintiff took medication for hyperthyroidism but was

not undergoing surgery for the condition.  The ALJ further noted that Plaintiff treated with Dr. Khan

every three months and took medications for her migraine headaches every day. The ALJ noted that

Plaintiff treated with Dr. Azad for her COPD and used oxygen at night.  The ALJ noted that Plaintiff

saw a counselor once a week and participated in group therapy twice a week.  He noted that Plaintiff

had gone to Conifer Park due to a relapse and that she had stopped taking Prozac[14] and BuSpar.[15]  The

ALJ found that the evidence of record did not support Plaintiff's allegations of debilitating fatigue and

pain.  The ALJ noted that although Plaintiff sought treatment for depression, she was non-compliant

with her medication.  AT 21, 23, 349, 353, 354, 362, 430, 493-94, 495.  Although Plaintiff asserted

fatigue due to sleep apnea, the ALJ noted that she did not keep her appointments with Dr. Irwin and did

not comply with her prescribed nocturnal oxygen therapy regimen.  AT 21; see AT 319-20.

The ALJ also considered Plaintiff's activities of daily living in making his credibility finding.

He noted that Plaintiff went grocery shopping, mopped her floors once a month, prepared some meals,

made her bed, did her laundry and went to school every day from 10:00 a.m. to 1:00 p.m.  AT 21.  The

ALJ noted that Plaintiff attended church and sat for one to one and a half hours during the services.

The ALJ noted that Plaintiff used a shower chair.  The ALJ also noted that Plaintiff napped four times

per day for between five and ten minutes.  The ALJ noted that Plaintiff walked to and spent time at the

park with her grandchildren for one to one and a half hours at a time.  AT 22.  Plaintiff's ability to

engage in these activities is consistent with Plaintiff's many reports of normal physical examinations.

---

[14] Prozac is a preparation of fluoxetine hydrochloride used in, *inter alia*, the treatment of depression.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1562 (31st ed. 2007).

[15] BuSpar is a preparation of buspirone hydrochloride, an antianxiety agent used in the treatment of anxiety disorders and for short-term relief of anxiety symptoms.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 269 (31st ed. 2007).

AT 22; see 235, 270-71, 272-73, 311, 402.

The ALJ further considered Plaintiff's testimony with respect to her functional capacity.  The ALJ noted that she could stand and walk for thirty minutes depending on her level of fatigue.  He further noted that she had no limitations with respect to sitting, that she could bend, kneel and stoop, that she could lift twenty pounds and had no problems grasping.  AT 21; see AT 499.  Plaintiff's ability to engage in these activities, however, is not consistent with symptoms so intense or frequent as to prevent all work activity.

Regarding Plaintiff's argument that the ALJ's decision was internally inconsistent and required clarification, the Court agrees that the ALJ mis-characterized Plaintiff's class schedule as daily from 10:00 a.m. to 1:00 p.m.  As noted above, while Plaintiff attended classes on a daily basis, the classes started and finished at different times over the course of the school week, i.e., not necessarily between 10:00 a.m. and 1:00 p.m.  See AT 503-04.  Standing alone, however, this mis-characterization regarding the hours of Plaintiff's classes does little to undermine the ALJ's credibility determination: based upon the ALJ's characterization, Plaintiff was attending classes for fifteen hours a week; based upon Plaintiff's testimony, she was attending classes for twelve or thirteen hours a week.  See AT 503.

Plaintiff also contrasted the ALJ's acknowledgment that she missed a week of school due to migraine headaches with his finding that there was no documentation in the record that claimant had missed a significant number of classes due to migraine headaches.  Plaintiff's argument hinges on whether having missed a week of classes constitutes a *significant* number of classes.  In an associated context, courts interpreting whether applicants qualify for childhood SSI benefits have addressed the question of what constitutes a significant number of class absences as it relates to a marked limitation.  For example, in Reid v. Astrue, 2009 WL 368656, at *23-25 (S.D.Fla. Jan. 8, 2009), the court

determined that a sixteen-year old claimant had missed five weeks of school between August 28, 2006,

and November 8, 2006, and calculated that claimant had missed a total of over nine weeks of classes

during the school year.  The court noted that under 20 C.F.R. § 416.926a(e)(2)(iv),[16] "a marked

limitation may be found based effectively on six weeks of absence in a one-year period due to illness."

Id. at *25.  The court found that the ALJ failed to adequately consider the claimant's frequent absences

had a limiting effect on her ability to function.  Id. at *26-27 (citing, *inter alia*, Witz v. Barnhart, 484 F.

Supp. 2d 524, 528-529, 531-32 (W.D.La. 2006) (reversing ALJ's decision and finding child had

extreme limitation in health and physical well-being where child's doctor stated he missed 24 school

days and was home schooled for year and a half due to illness, and teachers "noted that his repeated

medical absences from school adversely affected [child] even though he completed makeup work");

Burgos v. Shalala, 1995 WL 675491, at *3 (S.D.N.Y. Nov. 14, 1995) (upholding the ALJ's assessment

of a child's functioning and noting that while child was "absent from school for 16 of 176 days, . . .

there is no evidence that his cognitive ability or performance in school has suffered as a result.")); Cf.

Vo v. Commissioner of Social Sec. Admin., 236 Fed.Appx. 322, 323 n.1 (9th Cir. 2007) (finding that

the ALJ mis-characterized the claimant's testimony regarding his community college attendance and

explaining that claimant is "not able to engage in a 'normal day' when he misses classes *at least once a

week* because of pain [and] requires extra time to complete an exam because of pain limitations . . . .")

(emphasis added).

    The Court acknowledges that the above-cited case law and Regulation do not permit it to draw a

perfect analogy to Plaintiff's argument but nevertheless finds them instructive.  Here, Plaintiff missed a

---

[16] Section 416.926a(e)(2)(iv) addresses functional equivalence for children.

single week of classes during a sixteen week semester[17]–approximately six percent of her classes for the semester. The Court is not willing to interpret the ALJ's acknowledgment that Plaintiff missed a week of school due to migraine headaches and his finding that there was no documentation in the record that claimant had missed a *significant* number of classes due to migraine headaches as internally inconsistent or as requiring clarification.

Plaintiff's argument that the ALJ's conclusion that she did well in school demands a reversal because he failed to verify or ask for clarification concerning her scholastic experience and need to sleep in class is without merit.  Consistent with the ALJ's conclusion, the record clearly indicates that Plaintiff believed she was "doing well in school."  AT 349.  At the hearing Plaintiff testified that she "doze[d] off for short periods, five or ten minutes" but that the teacher and school "tolerate[d] it because they kn[e]w that [she had] problems."  AT 512.  The ALJ's decision reflects such testimony, noting that Plaintiff alleged that her school provided her with accommodations at school and that she napped four times per day for five to ten minutes.  AT 22.

Having reviewed the administrative transcript, the Court finds that the ALJ properly assessed the factors enumerated in 20 C.F.R. § 404.1529(c)(3)(i)-(vi) and § 416.929(c)(3)(I)-(vi).  The ALJ discussed Plaintiff's daily activities, medications, and other treatments.  The ALJ adequately explained his reasons for discrediting Plaintiff's statements and properly exercised his discretion in finding that Plaintiff's complaints of functional limitation were not fully credible.  See Mimms v. Secretary of

---

[17] In 2005, Plaintiff's spring semester classes at Hudson Valley Community College began Tuesday January 18th, concluded Thursday May 12th and included a ten-day spring and holiday break from the end of March through the beginning of May.  See Hudson Valley Community College via Internet Archive, http://web.archive.org/web/20050114031230/www.hvcc.edu/calendar.html (last visited April 1, 2009).

Health and Human Servs., 750 F.2d 180, 186 (2d Cir. 1984).  Furthermore, the substantial evidence

supports the ALJ's decision to partially reject Plaintiff's subjective complaints.  The matter in this

regard is affirmed.

**D.     RFC**

RFC is:

> What an individual can still do despite his or her limitations . . . . Ordinarily, RFC
> is the individual's maximum remaining ability to do sustained work activities in an
> ordinary work setting on a regular and continuing basis, and the RFC assessment
> must include a discussion of the individual's abilities on that basis.  A "regular and
> continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work
> schedule.

Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (quoting Social Security Ruling 96-8p, Policy

Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996

WL 374184, at *2 (SSA July 2, 1996)).  In making an RFC determination, the ALJ must consider a

claimant's physical abilities, mental abilities, symptomology, including pain and other limitations

which could interfere with work activities on a regular and continuing basis.  20 C.F.R. § 404.1545.

Here, the ALJ found that Plaintiff had the RFC to perform light work with certain non-

exertional limitations as described above.  The regulations define light work as "lifting no more than 20

pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the

weight lifted may be very little, a job is in this category when it requires a good deal of walking or

standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg

controls."  20 C.F.R. § 416.967(b).  The regulations provide that if someone is capable of performing

light work, then they are also capable of performing sedentary work absent additional limiting factors

such as loss of fine dexterity or inability to sit for long periods of time.  Id.  Sedentary work generally is

defined as work that involves lifting up to ten pounds at a time and occasionally lifting and carrying light objects.  20 C.F.R. § 404.1567(a).  It generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour workday.  Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

Plaintiff contends that the evidence of record fails to support the ALJ's RFC determination. Plaintiff submits that the record is replete with medical history and objective testing establishing severe sleep apnea despite the use of medication, including oxygen, and frequent and severe migraine headaches despite the use of medication.  Dkt. No. 10 at 15.  Plaintiff also argues that the ALJ's RFC determination exceeds her abilities and fails to adequately consider her subjective complaints.  Plaintiff further contends that the hypothetical questions the ALJ posed to the VE lack the support of substantial evidence and thus tainted the VE's conclusion and, by extension, any reliance by the ALJ on his conclusion.  Dkt. No. 10 at 11, 13, 14-15.  Defendant asserts that the medical evidence fully supports the ALJ's RFC finding and that Plaintiff's arguments are misplaced and without merit.  Dkt. No. 17 at 19-23.

### 1.      Review of the Record

An ALJ is not required to reconcile every shred of evidence.  See Jones v. Barnhart, 2004 WL 3158536, at *6 (E.D.N.Y. Feb. 3, 2004) (ALJ not obligated to address specifically each piece of evidence); Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 79 (N.D.N.Y. 2005) ("[F]ailure to cite specific evidence does not indicate that it was not considered.") (citation omitted).  Moreover, it is the ALJ's duty to determine a claimant's RFC, and not simply to "agree[ ]" with a physician's opinion. See 20 C.F.R. § 404.1546(c) ("If your case is at the administrative law judge hearing level . . . the administrative law judge . . . is responsible for assessing your residual functional capacity.").

### a.      Medical History and Objective Testing

The ALJ reviewed the record in some detail.  He discussed Plaintiff's medical history, including the results of examinations, opinions, test results and treatments.  He discussed the weight given to Plaintiff's treating physicians.  See AT 22-25.  In particular, the ALJ accorded great weight to the opinions of Dr. Papandrea and Dr. Papaleo who both concluded that Plaintiff was doing very well from a cardiovascular standpoint and that her blood pressure and atrial fibrillation were well-controlled by her medications.  AT 24; see AT 236, 310, 441.  The ALJ also credited Dr. Sam's assessments that Plaintiff's hypothyroidism, aortic aneurysm and atrial fibrillation were stable and well controlled.  AT 24; see AT 400.  The ALJ noted normal musculoskeletal examinations by both Dr. Sam and Dr. Adler despite Plaintiff's morbid obesity.  AT 24; see AT 186, 403.  The ALJ noted Dr. Khan's repeated assessment that Plaintiff's headache control was good while on medication.  AT 25; see AT 272, 273, 274, 276. The ALJ did not ignore evidence of Plaintiff's sleep apnea.  In his decision, the ALJ cited Plaintiff's treatment with Dr. Azad and noted that she had used "a C-PAP/BI-PAP for over one year but had not followed-up with appointments.  She reported that she did not have any significant complaints and she was doing well with the C-PAP machine.  She had no cough or shortness of breath."  AT 22; see AT 442.  The ALJ noted Dr. Bashkoff's opinion that Plaintiff could understand and follow simple directions, perform simple tasks and learn new tasks and her diagnosis that Plaintiff had major depressive disorder–severe without psychotic features.  AT 24; see AT 197.  The ALJ's specification that Plaintiff's work "must be low stress–no planning, no scheduling, no report writing, no supervising, no high production quotas, and no multi-tasking," AT 21, seems to credit her opinion and diagnosis. The ALJ committed no error in his review of the record.

**b.**      **Consideration of Subjective Complaints**

As discussed above, the Court found that the ALJ properly exercised his discretion in determining Plaintiff's credibility determination.  Moreover, the ALJ noted Plaintiff's testimony that she had no physical problems associated with sitting, could bend, kneel and squat to lift something from the ground, could lift twenty pounds, and had no problems with her hands or with her ability to grasp and hold things.  AT 21; see AT 499.  The ALJ incorporated environmental and postural limitations into Plaintiff's RFC, which precluded her from working in areas with concentrated fumes, odors, gases, dust or poor ventilation, and also specified that she was unable to perform work requiring climbing, heights or dangerous machinery.

**2.      ALJ's Hypothetical Questions to the VE**

Plaintiff argues that in discrediting her testimony regarding the degree and frequency of disability caused by her migraine headaches and episodes of sleep apnea, the ALJ's hypothetical questions to the VE and his responses lack the support of substantial evidence.  Dkt. No. 10 at 11, 13, 14-15.

Where a claimant is able to demonstrate that his or her impairments prevent a return to past relevant work, the burden then shifts to the Commissioner to prove that a job exists in the national economy which the claimant is capable of performing.  See Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); 20 C.F.R. §§ 404.1560(c), 416.960(c).  "[W]ork exists in the national economy when it exists in significant numbers either in the region where [the claimant] live[s] or in several other regions in the country."  20 C.F.R. §§ 404.1566(a), 416.966(a).  The ALJ may apply the Medical-Vocational Guidelines ("the grids") or consult a VE.  See Heckler v. Campbell, 461 U.S. 458, 462 (1983); Rosa v.

Callahan, 168 F.3d 72, 78 (2d Cir. 1999); 20 C.F.R. pt. 404, subpt. P, App. 2.

The vocational expert may testify as to the claimant's ability to perform jobs in the national economy, given her functional limitations.  See Colon v. Comm'r of Soc. Sec., 2004 WL 1144059, at *6 (N.D.N.Y. Mar. 22, 2004).  A vocational expert's testimony is useful only if it addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job.  See Aubeuf v. Schweiker, 649 F.2d 107, 114 (2d Cir. 1984) (citation omitted).  The ALJ is responsible for determining the claimant's capabilities based on all the evidence, and the hypothetical questions posed to the VE must present the full extent of the claimant's impairments to provide a sound basis for the VE's testimony.  Colon, 2004 WL 1144059, at *6.  However, there must be " 'substantial record evidence to support the assumption upon which the [VE] based his opinion.' "  Id. (quoting Dumas v. Schweiker, 712 F.2d 1545, 1553-54 (2d Cir. 1983)).

At the hearing, the ALJ asked the VE to assume a forty-seven year old female with a twelfth grade education currently taking classes at Hudson Valley Community College and the ability to perform light work with the following non-exertional limitations: (1) simple entry level job; (2) she can make simple decisions but there should be neither complex decision making nor multi-tasking; (3) no concentrated gases, fumes, odors, dust or poor ventilation; (4) no climbing, no stairs, no heights, no dangerous machinery.  AT 516-17.  The ALJ asked the VE whether Plaintiff could perform any of her past work as she previously had, and the VE replied that he thought that she could perform her previous work as an unskilled cashier.  The ALJ asked whether there were any other light jobs Plaintiff could perform given the above limitations.  The VE replied that Plaintiff could work as a cafeteria attendant, Dictionary of Occupational Titles 311.677-010, a light and unskilled position with a specific vocational

preparation of two and 106,000 and 340 positions available in the national and Capital Region[18] economies, respectively.  AT 517.  The ALJ asked the VE to assume the same limitations but that the hypothetical person could perform only sedentary work and asked whether there were any jobs given those restrictions.  The VE identified two additional positions: call out operator, Dictionary of Occupational Titles 237.367-014, a sedentary position with 48,431 and 288 positions in the national and Capital Region economies, respectively; and an addresser, Dictionary of Occupational Titles 209.587-010, with a specific vocational preparation level of 2, and 48,600 and 278 positions in the national and Capital Region economies, respectively.  AT 518-19.  Plaintiff's counsel questioned the VE and asked whether Plaintiff's migraine headache-related absences and/or episodes of decompensation would affect her ability to perform the jobs he identified in answering the ALJ's questions.  AT 519-25.  The VE answered that the combination of missing work and episodes of decompensation while at work would rule out work.  AT 525-26.

The ALJ's hypothetical questions accurately reflected his RFC determination.  Furthermore, as discussed above, the ALJ's credibility assessment was neither improper nor lacked the support of substantial evidence.  Accordingly, Plaintiff's argument is unfounded; the ALJ committed no error in his RFC determination.

The matter is affirmed in this regard.

**III.    CONCLUSION**

For the foregoing reasons, it is hereby

---

[18] The New York State Department of Labor defines the capital region as Albany, Columbia, Greene, Rensselaer, Saratoga, Schenectady, Warren and Washington Counties.  AT 517; http://www.labor.state.ny.us/workforceindustrydata/lslma.shtm (site last visited April 1, 2009).

**ORDERED,** that the decision denying disability benefits is **AFFIRMED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED**.

DATED:        April 07, 2009
              Albany, New York

Lawrence E. Kahn
U.S. District Judge